**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

TIMOTHY DUMPSON and MOSES ORTEGA,

                                                        Plaintiffs,

                    -vs-

GLENN S. GOORD, DONALD SELSKY,
MICHAEL McGINNIS, GEORGE J. BARTLETT,
RICHARD MORSE, ROCKY L. HAZELTON,
THOMAS F. EAGEN, JAMES MECK,                        DECISION AND
ROBERT F. McCLELLAN, BERNARD O'BREMSKI,             ORDER
and JOHN ALVES,
                                                    00-CV-6039-CJS
                                        Defendants.


**APPEARANCES**

For Plaintiffs:                    Spencer L. Ash, Esq.
                                   Brown & Hutchinson
                                   Two State Street Suite 925
                                   Rochester, NY 14614
                                   (585) 454-5050

For Defendants:                    J. Richard Benitez, A.A.G.
                                   NYS Office of the Attorney General
                                   144 Exchange Boulevard, Suite 200
                                   Rochester, NY 14614
                                   (585) 546-7430


**INTRODUCTION**

**Siragusa, J.** This is a prisoners' civil rights suit brought pursuant to 42 U.S.C.

§ 1983. Plaintiffs raised claims under the Eighth and Fourteenth Amendments regarding

the manner of their confinement at Southport Correctional Facility ("Southport"). Now

1

before the Court are cross-motions seeking summary judgment on the Eighth Amendment claims. Plaintiffs filed their motion for summary judgment (Doc. No. 115) on May 22, 2009, and Defendants filed their cross-motion (Doc. No. 119) on June 28, 2009. Following oral argument on February 10, 2010, the Court has reviewed the documents filed in support of, and in opposition to, the motions. For the reasons stated below, Plaintiffs' motion is denied, and Defendants' motion is granted.

## BACKGROUND

The present action commenced on January 26, 2000, with the filing of a complaint by several inmate plaintiffs. (Doc. No. 1.) Plaintiffs were denied class certification by order signed on March 12, 2001. (Doc. No. 32.) Following the dismissal of several plaintiffs' claims, the remaining plaintiffs are Timothy Dumpson ("Dumpson") and Moses Ortega ("Ortega"). By Stipulation and Order signed by the Court on April 5, 2001, all portions of the claims relating to Dumpson being placed in full restraints in 1995, 1996 and 1997 at Southport Correctional Facility ("Southport") were dismissed with prejudice, except those claims relating to defendants Bernard O'Bremski ("O'Bremski") and John Alves ("Alves"). (Doc. No. 52.)

On September 24, 2003, this Court signed a Decision and Order granting summary judgment against all plaintiffs with respect to the Fourteenth Amendment claims on the ground of qualified immunity, and directing that "the record should reflect that this action is discontinued against Mr. Coughlin and that Mr. Goord is substituted." (Doc. No. 52 at 1, fn.2 & 18.) On February 4, 2009, a Suggestion of Death was filed as to James Meck ("Meck"). (Doc. No. 111.)

2

Southport is exclusively a Special Housing Unit ("SHU"), only housing inmates with a history of disciplinary problems. Timothy Dumpson was an inmate at Southport from December 26, 1995, until October 27, 1999. (Pl. Motion for Summary Judgment, Ex. A, ¶ 7.) Moses Ortega was an inmate at Southport from approximately 1998 through 2000, and again from 2005 through 2008. (*Id.* at ¶ 9.)

From 1995 through 2000, Southport employed a Progressive Inmate Movement System ("PIMS") to classify inmates according to their disciplinary records. (Pl. Ex. J at 8.) Inmates transferred into Southport were automatically placed in PIMS Level I, the most restrictive level of confinement, for at least a thirty day adjustment period. (Pl. Ex. F at 3.) Level I inmates were placed in single-person cells and confined therein for twenty-three hours a day. (Pl. Ex. Q at 11 & 66.) They had no commissary privileges, with the exception of postage stamps. (Pl. Ex. Q at 4.) Pursuant to New York Department of Correctional and Community Supervision [1] ("DOCCS") policy, these inmates were restrained with handcuffs attached in front to a waist chain and leg shackles during all out-of-cell movement, including exercise periods. (Pl. Ex. D at ¶3.) Dumpson and Ortega were both classified as PIMS Level I inmates and subject to restraint orders at various times during their confinement at Southport. (*Id.* at ¶2.)

Pursuant to Southport's SHU Inmate and Staff Orientation Manual and DOCCS Directive 4933 § 304.3, all SHU inmates are permitted one hour of daily outdoor exercise. However, they may be mechanically restrained during that hour. Restraint orders are

---

[1] The department has changed its name following a merger with the Division of Parole.   The Department is now known as the New York State Department of Corrections and Community Supervision.

controlled by New York Compilation of Codes, Rules and Regulations Title 7, section

305.4, which states in full as follows:

> (a) Any inmate assigned to an SHU who has a history of assaultive behavior and/or who presents a threat to the safety or security of himself/herself, other persons, or State property may be placed under a restraint order by the deputy superintendent for security or, in his/her absence, the O.D. or higher ranking authority.

> (b) A restraint order will be valid for no more than seven days and may be renewed by the deputy superintendent for security or, in his/her absence, the O.D. or higher ranking authority.

> (c) A copy of the restraint order and any renewal thereafter must be forwarded to the superintendent and the inmate within 24 hours. The order and any renewal thereafter must briefly state the reason(s) for the order or renewal and contain the following notice to the inmate: "You may write to the deputy superintendent for security or his/her designee to make a statement as to the need for continuing the restraint order."

> (d) A restraint order will describe the types of restraints to be used and the manner in which they are to be applied (*e.g.*, handcuffed in front or in back, with or without waist chain, with or without leg irons).

> (e) If an inmate is under a restraint order directing that he/she be mechanically restrained whenever he/she leaves the SHU cell for any reason, the inmate will remain mechanically restrained during the entire period of time he/she is out of the SHU cell, except:

>> (1) Upon request of a physician, nurse practitioner, or a physician's assistant (P.A.) when removal is necessary to permit medical treatment;

>> (2) Upon request of the Parole Board at a parole hearing;

>> (3) Upon the request of the judge or magistrate;

>> (4) When the inmate can be secured in a shower room during the scheduled shower period;

>> (5) When the inmate has been secured in the exercise area, unless the restraint order (or renewal) includes a written determination stating the reason(s) why the removal of restraints in the exercise area would, in the

light of the particular circumstances relative to the affected inmate, present a threat to the safety or security of the inmate, other persons or state property. Such a determination, in any restraint order or renewal, shall only remain in effect for three days unless approved in writing by the superintendent or acting superintendent, based upon his or her review of the relevant facts. Note: This paragraph does not apply to Southport Correctional Facility;

(6) Upon order of the deputy superintendent for security services or higher ranking authority; or

(7) When in a general population visiting room and not in a noncontact area.

(f) When mechanical restraints are removed pursuant to subdivision (e) above, they will be reapplied as specified in the restraint order prior to return to the SHU cell.

N.Y. Comp. Codes R. & Regs. tit. 7, § 305.4 (2010).

In 1997, Superintendant Michael McGinnis ("McGinnis") requested and received authorization from Deputy Commissioner George J. Bartlett ("Bartlett") to handcuff Level I inmates behind their backs with a waist chain and leg shackles for staff safety, due to a series of assaults that took place around that time, which had resulted in injury to both inmates and corrections officers. (Def. Mot. Summ. J., Statement of Facts, Ex. D.) Subsequently, a Restraint Order for Level I inmates at Southport meant that said inmates would be placed under what is commonly referred to as "full restraints," meaning that they were handcuffed behind their backs with a waist chain and leg irons affixed during all out-of-cell movement, including exercise periods. (Pl. Ex. H at 5.) Level I inmates were not so restrained while in their cells.

A Restraint Order could be initiated for alleged non-assaultive, non-violent offenses, such as uncooperativeness or yelling, and could be based on the

recommendation of a tier sergeant, who was under no formal obligation to corroborate allegations of prisoner misconduct before recommending a Restraint Order to the Deputy Superintendent. (Pl. Ex. G at 18-19.) No formal investigation was conducted prior to Southport officials approving Restraint Orders. (*Id.*)

During Plaintiffs' confinement at Southport, Level I inmates were subjected to the following procedure prior to leaving their cells for exercise:

a. handcuffed through the cell feed-up port;

b. instructed to turn their back to the cell door prior to the cell door being opened;

c. instructed to take one step back from their cell to the outer walkway;

d. a waist chain and leg irons were applied by at least two guards;

e. inmates were scanned by a metal detector and pat frisked for contraband; and

f. placed in a single person, enclosed, exercise cage under guard supervision.

(Pl. Ex. G at 35-38.) Inmates exercised in an enclosed, single person exercise pen made of fencing, approximately twelve feet long, ten feet wide and fifteen high with a gate slot whereby handcuffs could be applied and removed while inmates were within the enclosed fencing. (Pl. Ex. Q at 70-71.)

Throughout the course of their confinement at Southport, Plaintiffs were issued several Restraint Orders for alleged misconduct, and placed in full restraints during all out-of-cell movement, including their exercise periods. (*See* Pl. Ex. C & D.) Additionally, throughout their confinement at Southport, Plaintiffs addressed several grievances to officials at DOCCS and Southport regarding the shackling policies, as well as the severe pain and mental anguish they alleged was caused thereby. (*See* Pl. Ex. K, L, & N.)

6

Dumpson and Ortega complained of severe back and shoulder pain as a result of being in full restraints during exercise periods, and continuously requested front cuff orders. (*Id.*)

Additionally, during the course of their confinement at Southport, Plaintiffs were each issued various Deprivation Orders for alleged misconduct, depriving them of the right to out-of-cell exercise, in addition to showers, visitations, and commissary and hygiene products. (Pl. Ex. O.) DOCCS regulations contain a section on deprivation orders, which states, in part, "[a]n order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists." DOCCS Directive No. 4933 (Jan. 20, 2004), § 305.2(a). (Pl.s' Ex. F at 12.) Plaintiffs were made to go as long as one month without exercise, and several weeks without a shower. (*Id.*) No formal investigation was conducted prior to the approval and implementation of a Deprivation Order. (Pl. Ex. G at 35-36.)

## STANDARDS OF LAW

### A. Summary Judgment

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interroga-tories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing

that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S.

1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

### B.  *42 U.S.C § 1983*

Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, which provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1996). In order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New*

9

*York*, 985 F.2d 94, 98 (2d Cir. 1993); *see Missel v. County of Monroe*, 351 Fed. Appx. 543 (2d Cir. Nov. 4, 2009) (citing to *Dwares* to hold that, "[t]he allegations that Hildreth acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient.").

### C. *Eighth Amendment Violations*

"An official violates the Eighth Amendment prohibition against cruel and unusual punishment when two requirements are met." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997).   First, the alleged punishment must be found to be "'objectively, sufficiently serious.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed.2d 811 (1994)). "'Under the objective standard, conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional.'"   *Boddie*, 105 F.3d at 861 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L. Ed.2d 59 (1981)). "Second, the prison official involved must have a 'sufficiently culpable state of mind.'" *Boddie*, *supra* (quoting *Farmer*, *supra*).

### 1.  The Objective Element

On the objective issue, not every deprivation is "sufficiently serious" to reach constitutional dimensions. *Farmer,* 511 U.S. at 834. "The Constitution . . . does not mandate comfortable prisons, and only those deprivations denying the minimal civilized measure of life's necessities" will qualify as sufficiently serious. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). A claim must be based on "extreme deprivations," that are "repugnant to the conscience of mankind," not simply on conditions that are merely unpleasant or annoying to the inmate. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1982) (quoting *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976)); *see also Sostre v. McGinnis,* 442 F.2d 178, 191 (2d Cir.1971). Prison conditions that result in the "unnecessary and wanton" infliction of pain, and are "totally without penological justification," are unconstitutional. *Rhodes v. Chapman*, 452 U .S. 337, 346 (1981).

For a deprivation of medical care to satisfy the objective element, the alleged deprivation must be "sufficiently serious." *Muhammad v. Francis*, 1996 WL 657922, at * 5 (S.D.N.Y. Nov. 13, 1996). To be sufficiently serious, the medical need must be a condition that "may produce death, degeneration, or extreme pain."   *Pearson v. Coughlin*, 1997 WL 566129, at * 3 (S.D.N.Y. Sept. 19, 1997). The condition does not have to occur immediately; it suffices if it presents itself "in the next week or month or year." *Id.*

## 2.  The Subjective Element

With regard to the subjective component of the test, a plaintiff must prove that the defendants were deliberately indifferent to the prisoner's needs. Deliberate indifference is shown if the claims indicate that the officials "kn[ew] of and disregarded an excessive risk to inmate health or safety."   *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert denied*, 515 U.S. 1154 (1995). "The official must both be aware of the facts from which the inference could be drawn that the substantial risk of serious harm exists, and he must also draw the inference." *Pearson*, 1997 WL 566129, at * 3 (citation omitted).

This standard is subjective. *Id.* at *2. Mere negligence is not enough to support a claim under 42 U.S.C. § 1983; the conduct in question must be a "barbarous act that shocks the conscience." *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, (2d Cir. 1970) (internal quotation and citation omitted). There must be, as a threshold matter,

11

"allegations of a conscious or callous indifference to a prisoner's rights." *Webb v. Jackson*, 1994 WL 86390, at *2 (S.D.N.Y. Mar. 16, 1994) (citation omitted). The Supreme Court has held that "deliberate indifference to the serious medical needs of prisoners constitutes an unnecessary and wanton infliction of pain" in violation of the Eight Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation and citation omitted).

## ANALYSIS

At the outset, the Court notes that Plaintiffs' counsel have prepared extensive papers in support of their motion and in opposition to Defendants' motion, all based on this Court's pro bono assignment of January 24, 2006. The Court appreciates the guidance provided by counsel's papers.

Plaintiffs contend that by being kept in "full restraints" during their exercise period, temporary denials of any daily exercise, and confinement to small cells in "often squalid and unsanitary" conditions, Defendants violated Plaintiffs' Eighth Amendment rights. (Pl. Mem. of Law, at 5.)

### A.  Use of Mechanical Restraints During Exercise

The Court is familiar with Dumpson's claims regarding being kept in shackles while exercising. In an earlier lawsuit involving Dumpson, raising the same argument with regard to being shackled during exercise periods, this Court granted summary judgment to the defendants on the ground of qualified immunity with regard to the issue of shackling during exercise periods. *Dumpson v. McGinnis*, No. 96-CV-7580-CJS-JWF (W.D.N.Y.

Oct 3, 2000). Following a trial on the remaining issue, Dumpson appealed. In affirming

this Court's judgment, the Second Circuit wrote,

> The district court held that no clearly established Eighth Amendment right to exercise existed in this circuit. We disagree. We have stated that an inmate has a right to some "opportunity to exercise," subject to a "safety exception." However, despite our disagreement with the district court's reasoning, we affirm on another ground. Although Dumpson had a clearly established right to some opportunity for exercise, we have also held that the right could be limited by legitimate safety concerns. The evidence adduced at trial indicated that the defendants did make such a decision and that it was reasonable in light of Dumpson's disciplinary history.

*Dumpson v. McGinnis*, 348 Fed.Appx. 658 (2d Cir. Oct. 13, 2009) (citations omitted).

In order to succeed on an Eighth Amendment claim involving denial of exercise, a

plaintiff must show that he was denied all meaningful exercise for a substantial period of

time. *See Davidson v. Coughlin,* 968 F. Supp. 121, 129 (S.D.N.Y.1997). Factors to

consider in making this determination are: (1) the duration of the deprivation; (2) the

extent of the deprivation; (3) the availability of other out-of-cell activities; (4) the

opportunity for in-cell exercise; and (5) the justification for the deprivation. *Williams v.*

*Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001).

Other than exercise periods, Plaintiffs were confined to their cells twenty three

hours a day. Although Plaintiffs contend that they could not "exercise" while wearing

restraints during their hour of out-of-cell exercise, they were able to walk about, and were

not restrained while in their cells, all of which is sufficient for Eighth Amendment

purposes. *Black v. Goord*, 03-CV-6155 CJS, 2007 WL 3076998 (W.D.N.Y. Oct. 19,

2007); *Dabney v. McGinnis,* No. 97-CV-489A, 2006 WL 1285625 (May 9, 2006) (No

constitutional violation where inmate was kept in full restraints, but was able to walk

about, and was not restrained while in cell.) Dumpson admits that he could walk, and was observed "doing knee bends and knee stoops" while in full restraints. (Ex. I at 47.)

As for Plaintiffs' argument that there is no reason they could not be released from restraints during their daily exercise, Defendants claim that "increasing the number of times restraints must be placed upon an inmate increases the opportunity for an inmate already prone to violence against corrections officers to engage in additional infractions." (Def. Reply Mem., [#132].) Plaintiffs concede that each has committed acts of violence during incarceration. (Pl. Mem. of Law at 8) Dumpson testified at his pretrial deposition that, "I have a very poor disciplinary record. I have a lot of assaults and fighting and disobeying a direct order and violent conduct and stuff like that on my record. . . . I would say I have approximately six fights on my record." (Dumpson Dep. at 14:18–20, 23–24.) In addition, he testified that he had five or more incidents of violent acts between himself and correctional staff prior to being transferred to Southport, including his involvement in a hostage situation where "five correctional officers . . . [were] taken hostage for fourteen hours in the special housing unit . . . on August 1st, 1988." (*Id.* at 15:9–13 & 16:6–10.)

Plaintiffs have included, in their Exhibit C, twenty seven restraint renewal orders. [#115-6] The first, dated December 26, 1995, references Dumpson, stating, "[t]his inmate has an extremely assaultive history causing grave injury to staff. Inmate is a leader and active participant in the serious disturbance at Coxsackie C.F. Inmate continues to be a serious threat to staff." (*Id.* at 2.) The next, dated January 1, 1996, refers to the Coxsackie incident and adds "12-28-95 115.10 Weapon." (*Id.* at 3.) The restraint renewal orders continue in that same vein throughout the exhibit. Some appear to recount more recent

14

disciplinary infractions (by citation to a number, such as 104.11, 102.10, and date, 1/16/96). The restraint renewal order of February 10, 1997, recites a number of infractions that appear to have occurred in 1996 as justification, along with mention of the Coxsackie incident, for continuing to restrain Dumpson. (*Id.* at 12.)

Exhibit C also contains restraint renewal orders for Ortega, the first from October 27, 2005, stating that he should be restrained "because of the following reasons: 110.10 assault on inmate, 104.10 violent conduct, 106.10 disobey, 107.10 physical interference. Inmate Ortega was observed seriously assaulting another inmate (kicking and stomping), refused orders to stop, and continued to struggle with staff even after force was applied." (*Id.* at 18.) Evidently, this occurred on October 27, 2005, and the same incident is mentioned in the restraint renewal orders of November 7, 2005, November 14, 2005, November 21, 2005, when the word, "DISCONTINUE" appears at the bottom of the restraint renewal order. (*Id.* at 19–22.) The next restraint order is dated May 19, 2006, and on it are the following reasons: "MBR 5-19-06: 106.10 direct order, 102.10 threats, 107.11 verbal harassment. Inmate refused to turn on cell light during sick call rds [sic], also verbally harassed and threatened bodily harm to staff." (*Id.* at 23.)

Far from showing that Defendants acted wantonly, Exhibit C shows what Plaintiffs themselves claim — that they have committed acts of violence during their incarcerations. Their continuing misconduct, in some cases with violence, justified the application of restraints in accordance with DOCCS regulations.

The Court heeds the admonishments of the Seventh Circuit and the Supreme Court, that in the context of a prisoner civil rights lawsuit,

> "a prison's internal security is *peculiarly* a matter normally left to the discretion of prison administrators." Although prison officials are not free under any circumstances to use physical force indiscriminately or physical force that is wholly lacking in legitimate penological justification, we must remember that prisons are not country clubs, nor, for that matter, democracies. . . .

*Colon v. Schneider*, 899 F.2d 660, 669 (7th Cir. 1990) (quoting *Rhodes v. Chapman*, 452 U.S. 337 (1981)). Plaintiffs' evidentiary submissions lack proof of the gravamen of an Eighth Amendment claim: the wanton infliction of objectively serious harm. Accordingly, keeping Plaintiffs in full restraints during exercise periods did not rise to the level of an Eighth Amendment violation, and summary judgment is granted in favor of Defendants on this issue.

### B. Deprivation Orders Concerning Exercise and Hygienic Privileges

Plaintiffs also claim that Defendants violated their Eighth Amendment rights by issuing orders depriving them of their hour of daily outdoor exercise for periods of up to thirty one days, and hygienic privileges for slightly shorter periods. During the course of their confinement at Southport, Plaintiffs were issued deprivation orders for alleged misconduct, depriving them of out-of-cell exercise, in addition to showers, visitations, and commissary and hygiene products. (Pl. Ex. O.)

### 1. Objective Element

Although the Second Circuit has approved one hour of outdoor recreation per day, it has not held that to be the constitutional minimum. *Shakur v. Sieminski*, 3:07-cv-1239(CFD), 2009 U.S. Dist. LEXIS 60796 (D. Conn. July 15, 2009). Instead, deprivations of exercise for a relatively brief periods of time are usually upheld. *Ford v. Phillips*, 05 Civ. 6646 (NRB), 2007 U.S. Dist. LEXIS 25226 (S.D.N.Y. Mar. 28, 2007)

16

(finding that, as a matter of law, minor and temporary deprivations of property, showers and recreation "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment."); *see, e.g., Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (finding that keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment); *Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 U.S. Dist. LEXIS 27481 (N.D.N.Y. Mar. 31, 2009) (declaring Eighth Amendment claim without merit because denial of opportunity to exercise outdoors for less than two weeks was de minimis); *Davidson,* 968 F.Supp. at 131 (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment); *Arce v. Walker,* 907 F.Supp. 658, 662-63 (W.D.N.Y. 1995) (Eighth Amendment not violated when inmate was deprived of out-of-cell exercise for eighteen out of nineteen days).

By contrast, courts have granted summary judgment to prisoners in cases where the magnitude of the deprivation of exercise was obvious. *See Williams v. Greifinger,* 918 F.Supp. 91, 98 (S.D.N.Y.) (plaintiff entitled to summary judgment where he was deprived of exercise for 589 days), *rev'd on other grounds,* 97 F.3d 699 (1996); *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (upholding preliminary injunction requiring prison officials to release inmate from medical keeplock when inmate allowed out of cell only ten minutes per week for over three and a half years). However, there is no bright line in these cases. *See George v. McGinnis*, 05-CV-84(Sr), 2008 U.S. Dist. LEXIS 72698, *13-14 (W.D.N.Y. Sept. 23, 2008) ("While the Court would have no difficulty determining that the denial

of…exercise for twenty-three days was reasonably calculated to restore prison discipline and security…, it could not justify withholding [exercise] from plaintiff for sixty days.").

Plaintiffs have included the Deprivation Orders for Ortega in their Exhibit O. On October 28, 2005, Ortega was deprived of "exercise, showers, cell clean-up, and haircuts," for the following reasons: "100.10 assault of inmate, 104.10 violent conduct, 106.10 disobey, 107.10 physical interference. Inmate Ortega was observed assaulting another inmate (kicking and stomping), refused orders to stop, and continued to struggle with staff even after force was applied." (*Id.* at 2.) Ortega's clean-up privileges were restored four days later, haircuts after eight days, and showers after ten days. Ortega's exercise privileges were restored after twenty days. Restoration of privileges was based on daily evaluation of his behavior, *e.g.*, "remains disruptive" and "harassing staff." (*Id.*)

A second deprivation order, dated May 19, 2006, deprived Ortega of "exercise, showers, cell clean-up, & haircuts," for the following reasons: "MBR 5-19-06; 106.10, 102.10 threats; 107.11 harassment (verbal); Refused to turn on cell light during sick-call rds [sic], also verbally harassed and threatened bodily harm to staff." (*Id.* at 6.) Cell clean-up was restored one day later, and haircuts and showers within thirteen days, and exercise was restored after fourteen days. (*Id.* at 6-8.) The report notes that on May 20, Ortega was "ignoring staff direction," and on May 21, he was "insolent towards staff."

A third deprivation order, dated August 27, 2006, deprived Ortega of "exercise, shower, cell clean-up, haircuts" because "[he] threw feces and food on the gallery (118.22, 116.10 MBR date 8-27-06)." (*Id.* at 9.) On the following days, Ortega was reported as "disruptive on gallery – argumentative with staff," "uncooperative with staff,"

18

"disruptive in gallery – uncooperative," "poor attitude, very argumentative with staff, refuses direction," until September 27, 2006, when the report notes "improvement shown." (*Id.* at 9-14.) Although cell clean-up was restored after five days, haircuts after seven days, and showers after twelve days, Ortega went a total of thirty one days without exercise. (*Id.* at 14.)

Although these deprivation orders only pertain to Ortega, Plaintiffs allege that Dumpson was subjected to similar deprivations, both in terms of durations and privileges denied. (Ash Aff. in Opp., ¶ 7) Dumpson alleged the following in his deposition:

Q: How many times have you been placed on a deprivation order during the time you were at Southport, can you recall?

A: I would say approximately four times.

Q: And can you describe the periods of time that the deprivation orders lasted for each one of those four times?

A: The first time I was placed on one it lasted approximately two weeks, the second time, approximately the same amount of [time], two weeks, and the third one, I believe it was around the same amount of time, around two weeks, and the last time I was placed on one, which was in 1999, it lasted maybe a week, a little more than a week.

Q: So it's your testimony that on at least three occasions you were denied the ability to shower, clean your cell or go to exercise for two weeks at a time?

A: Yes.

. . .

Q: Were you ever placed on a deprivation order for non-violent, non-assaultive conduct?

19

A: Yes, in 1996 -- 1995, when I arrived at Southport, they placed me on a deprivation order because they claimed that they found weapons in my property and they placed me on a deprivation order for approximately 2 weeks.

(Def. Ex. L, at 76-78.)

It is clear that deprivation orders against Plaintiffs for shorter periods of time did not involve the severity of treatment necessary to violate the Eighth Amendment. Thus, as Dumpson alleges that he was never subjected to a deprivation order for longer than two weeks, his claims do not constitute an unconstitutional deprivation. Likewise, Ortega's first and second deprivation orders, lasting fourteen and twenty days respectively, are not unconstitutional deprivations either. Lastly, although Ortega's third deprivation order, lasting for thirty-one days, presents a closer question, it does not reach the level of an objectively unconstitutional deprivation of exercise. Accordingly, summary judgment is granted in favor of Defendants with regard to these deprivations.

### 2.  Subjective Element

Even if the Court were to hold that Ortega's thirty-one day deprivation of exercise did satisfy the objective element of an Eight Amendment violation, Ortega would still be unable to satisfy the subjective element of the test. In order to do so, he would have needed to prove that Defendants possessed culpable intent – *i.e.* they knew Ortega faced a substantial risk to health or safety, yet disregarded the risk by failing to take corrective action. *Farmer*, 511 U.S. at 837. "When the conditions complained of are the result of disciplinary measures imposed against an inmate, the 'deliberate indifference standard must be applied in a way that accounts for the precise circumstances of the alleged

20

misconduct and the competing institutional concerns.'" *George v. McGinnis*, No. 05-CV-84(Sr), 2008 U.S. Dist. LEXIS 72698 (W.D.N.Y. Sept. 23, 2008) (quoting *Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003))*; see Hope v. Pelzer*, 536 U.S. 730, 737, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (noting that penological concerns may be considered in reviewing an Eighth Amendment claim). Thus, the Court must ask whether a deprivation order was "reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [a plaintiff's] health and safety." *Trammell*, 338 F.3d at 163.

First, the Court finds that the August 27, 2006, deprivation order was a reasonable response to Ortega's behavior, and served a clear penological purpose, *i.e.* the effective quelling of disruptive and violent behavior. The undisputed facts here show that following the Aug. 27 feces-and-food throwing episode. Ortega frequently threatened staff and was uncooperative. While such behavior would not justify a longer-term deprivation, it would justify a shorter, more temporary one, such as was implemented.

Second, the Court finds that the deprivation order was not enforced with deliberate indifference to Ortega's health or safety. His behavior was reviewed daily, he had access to medical staff, and he was not subjected to the deprivation order any longer than was deemed penologically necessary. Accordingly, Ortega's August 27, 2006 deprivation order does not satisfy the objective or subjective requirements of an Eighth Amendment violation, and summary judgment is granted in favor of Defendants.

### C.  Deliberate Indifference to a Serious Medical Need

Plaintiffs claim that Defendants O'Bremski and Alves were deliberately indifferent to the harm caused by wearing full restraints during exercise periods, in that they failed to diagnose, protect, and adequately treat Plaintiffs' serious medical conditions. While failure to alleviate a significant risk of harm that an official should have perceived but did not is "no cause for commendation, [it] cannot . . . be condemned as the infliction of punishment." *Farmer,* 511 U.S. at 838-40 (adopting criminal law standard of subjective recklessness to determine deliberate indifference under the Eighth Amendment). Accordingly, a mere "complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106. Similarly, a disagreement over the proper treatment does not rise to a constitutional claim. "So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Guarneri v. West*, No. 05-cv-6483L, 2011 WL 1709843, 2011 U.S. Dist. LEXIS 48453 (W.D.N.Y. May 6, 2011). In *Estelle*, the Supreme Court ruled that deliberate indifference may be presumed from a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting access to medical care, or intentional interference with prescribed treatment. 429 U.S. at 104-05.

In contrast, Southport medical records show that although Plaintiffs frequently complained of back and shoulder pain, which they attributed to being in full restraints

during exercise periods (Pl. Ex. K & L), they also had daily access to medical staff. (Def. Ex. J at 26-29.) Although Defendants acknowledge that complaints and grievances from prisoners concerning pain caused by full restraint procedures were not uncommon, front cuff orders were granted in cases of medical necessity. (Pl. Ex. G at 41-42.) Upon receiving a complaint, Dr. Alves would evaluate the inmate and, if he deemed it medically necessary, would issue an order for the inmate to be handcuffed in the front instead of the back. (Def. Ex. F at 22-23.)

Both Plaintiffs filed requests for front cuff orders, which were evaluated and denied. (Pl. Ex. K, L, & N.) Dumpson was seen multiple times by Southport medical staff in response to his complaints of back pain, and was given medication for the pain, as a front cuff order was not deemed medically necessary. (Pl. Ex. K.) On December 6, 1996, Dumpson saw Dr. Alves, who advised him that there was no medical need for a front cuff order. (*Id.* at 9.) In 1997, Dr. Alves ordered x-rays taken of Dumpson, which did not show any structural damage, fracture or dislocation. (*Id.* at 5.) On August 19, 1999, medical staff attributed Dumpson's back pain to over-exercise, based on his statement that he was exercising vigorously; it was recommended that he decrease exercise rather than be cuffed in the front. (*Id.* at 16).

Ortega also saw medical staff on multiple occasions. (Pl. Ex. L.) On March 2, 1995 and April 4, 1997, a series of x-rays were taken of his spine and shoulders, which revealed a slight scoliosis of the thoracic spine, but no fracture or dislocation. (*Id.* at 11, 25.) On October 28, 1996, he complained of pain in his right shoulder, which was diagnosed as tendinitis, and was prescribed an anti-inflammatory. (*Id.* at 7.) On January

23

14, 2002, a chest exam revealed "metallic foreign bodies . . . consistent with old gunshot wounds." (*Id.* at 23.) Another spinal examination on September 8, 2005 revealed "[n]o evidence of significant degenerative change or acute fracture or malalignment." (*Id.* at 20.)

This evidence does not demonstrate a failure to alleviate a risk of serious harm. Without deciding whether Plaintiffs' ailments constitute serious medical conditions, these claims appear to be a mere disagreement over proper treatment, and thus do not constitute an Eighth Amendment violation. Accordingly, summary judgment is granted in favor of Defendants on this issue, and all claims of deliberate indifference to a serious medical need are dismissed against O'Bremski and Alves.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment, [#115] is denied, and Defendants' cross-motion for summary judgment [#122] is granted. As such, all of Plaintiffs' remaining claims are dismissed.

IT IS SO ORDERED.

Dated:   September 15, 2011
         Rochester, New York

ENTER        /s/ Charles J. Siragusa
             CHARLES J. SIRAGUSA
             United States District Judge